The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. Upon much detailed reconsideration of the evidence as a whole, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner with some modifications. The Full Commission in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
Accordingly, the undersigned find as fact and conclude as matters of law the following, which were entered into by the parties at the initial hearing as
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the plaintiff-employee and defendant-employer.
3. The employer was insured by Companion Property and Casualty.
4. Plaintiff's average weekly wage was $196.00 per week.
5. Dr. Stringfield and Dr. Dray are medical doctors duly licensed to practice medicine in the State of North Carolina. Dr. Stringfield specializes in Family Medicine and Dr. Dray specializes in the Hand and Upper Extremity. If both of the doctors were present and testifying under oath by deposition or in a hearing before the North Carolina Industrial Commission in this case, both doctors would testify in accordance with the contents of the medical reports attached to their respective depositions and received in evidence.
*******************
Based upon all the competent, credible, and convincing evidence of record, the undersigned make the following additional
FINDINGS OF FACT
1. At the time of the initial hearing, plaintiff was 35 years old and had received her GED. Plaintiff also had some Certified Network Administrator training at Haywood Community College. Plaintiff was not employed at the time of the initial hearing.
2. Plaintiff began working for defendant-employer around January, 1992 and was terminated by defendant-employer on August 17, 1994. Plaintiff's average weekly wage was $196.00, yielding a compensation rate of $130.76 per week.
3. In April, 1993, Plaintiff was employed by Defendant-Employer as a "lead folder", where she folded surgical drapes. Plaintiff's job duties were as follows: plaintiff would place surgical drapes in stacks of 20 until there was a stack of 100 on the table, this activity taking 10 to 15 minutes; plaintiff would then fold each individual drape into a fan-type fold, holding the drape with her left hand and folding with her right as fast as she could until the drape was folded into a small square. Plaintiff would fold 20 drapes at a time, box them, and put them on a pallet, taking approximately 7 to 12 minutes to fold a stack of 20. Plaintiff would then fold and box the remaining 80 drapes and, when finished, would repeat the process again for the full work day. Plaintiff worked eight hours a day, five days per week, with two 15-minute breaks per day and 30 minutes for lunch. Plaintiff had been performing this job since she began working at defendant-employer in January, 1992.
4. In February or March, 1993, plaintiff began to have pain and cramps in her right hand and wrist while working. Plaintiff reported this to her supervisor, Brenda Buchanan.
5. Defendant-employer refused to send plaintiff to a doctor, and on April 14, 1993, plaintiff sought medical treatment for the right wrist and hand pain from Dr. John Stringfield, plaintiff's family doctor.
6. Dr. Stringfield noted that plaintiff had had the pain in her wrist for the past one to two weeks with the pain steadily increasing. After noting that plaintiff worked at a job where she did repetitive movements with her right hand and wrist, Dr. Stringfield diagnosed probable carpal tunnel syndrome. Dr. Stringfield prescribed a splint and Naprosyn, and held plaintiff out of work for two to three days.
7. On April 22, 1993, plaintiff returned to Dr. Stringfield with complaints of numbness and paresthesias in the right hand. An examination revealed a positive Tinel's test, which Dr. Stringfield diagnosed as carpal tunnel syndrome. Dr. Stringfield authorized plaintiff to return to work but restricted her from repetitive activities of the right wrist.
8. On June 14, 1993, Dr. Stringfield reported that plaintiff's carpal tunnel syndrome was resolving, however, he noted that plaintiff had not been working.
9. Although Dr. Stringfield did not see plaintiff from June, 1993 until May, 1995, he believed that if plaintiff continued to have the same symptoms in May, 1995 that she had had in June, 1993, then in the meantime, plaintiff would not have been able to perform the repetitive movement job duties.
10. In the Spring of 1993, plaintiff was laid off from her job. Plaintiff received unemployment benefits of $94.00 per week for approximately ten weeks, but plaintiff received no Workers' Compensation benefits.
11. Approximately ten weeks later, plaintiff returned to defendant-employer's employment, working in different jobs at first, and she ultimately returned to the lead folder job. Plaintiff's right hand continued to hurt during this time.
12. On September 27, 1993 plaintiff presented to Dr. Gregory Dray, a hand surgeon at Carolina Hand Surgery Associates. Plaintiff reported worsening nighttime paresthesias. Dr. Dray diagnosed plaintiff with probable mild right carpal tunnel syndrome and injected plaintiff's carpal canal with Dalalone. He also fitted plaintiff with a night-resting splint to also be worn while working.
13. Dr. Dray saw plaintiff again on October 18, 1993, noting that her symptoms were improved from the carpal tunnel injection. Dr. Dray opined that plaintiff's right carpal tunnel syndrome was work-related.
14. On February 9, 1994, Dr. Dray restricted plaintiff to a weight restriction of 10 pounds on the right hand and no use of arm above her shoulder.
15. Defendant-employer sent plaintiff to Dr. Al Osbahr on March 9, 1994. Plaintiff was diagnosed with right shoulder/trapezius muscle chronic strain with possible thoracic outlet syndrome and possible carpal tunnel syndrome. Plaintiff was limited to working with her left arm only.
16. Plaintiff returned to Dr. Osbahr's office on March 16, 1994 due to continued numbness and tingling in plaintiff's fourth and fifth fingers of her right hand that appeared to be worse with movements of the shoulder and certain positions of plaintiff's wrist.
17. Plaintiff continued to experience pain in her right wrist and hand, and her productivity decreased. Plaintiff also received a warning slip from defendant/employer regarding her frequent absenteeism. Defendant/employer terminated plaintiff on August 17, 1994. Plaintiff received unemployment of $105.00 per week until it expired in February, 1995.
18. On July 11, 1995, almost a year after her termination, plaintiff presented to Dr. Lipsey for the continuing pain in her right wrist and hand, right shoulder and minimally in plaintiff's neck. Upon examination the Tinel's sign and Phalen maneuver tests were negative, but Dr. Lipsey stated that his findings were not definitive.
19. Plaintiff returned to Dr. Dray on September 13, 1995 complaining again of symptoms in her right hand including night-time paresthesias. Plaintiff had a positive Tinel's sign. Dr. Dray believed plaintiff was likely suffering from carpal tunnel syndrome and he gave her another injection.
20. On October 30, 1995, plaintiff returned to Dr. Dray significantly improved from the injection; plaintiff was told to wear the night-resting splint for at least three months. Plaintiff returned on January 17, 1996, complaining of significant discomfort. Dr. Dray gave plaintiff another injection and continued plaintiff's weight restriction of ten pounds, no use of the arm above the shoulder, and night-splinting. Dr. Dray opined that the fact that carpal tunnel injections had improved plaintiff's condition supported his diagnosis of carpal tunnel syndrome.
21. Although Dr. Lipsey opined that plaintiff had a 0% permanent partial disability rating when he examined her, Dr. Dray was unable to give plaintiff a permanent partial disability rating because he believed plaintiff's condition was still changing.
22. Based on a description of plaintiff's job duties, Dr. Dray and Dr. Stringfield agreed that plaintiff's job duties caused, contributed to or were a significant factor in the provocation or development of plaintiff's carpal tunnel syndrome. Dr. Lipsey felt that plaintiff had no significant carpal tunnel compression as of July 1995. However, the undersigned do not find his opinions to be as credible or convincing as those of Dr. Dray and Dr. Stringfield in that these two treating physicians first saw plaintiff at a time period closer in proximity to the development of plaintiff's condition. In particular Dr. Dray had a continuing perspective of plaintiff's condition both before and after her termination from the employment she was performing when she developed the condition.
23. Plaintiff was at an increased risk of contracting carpal tunnel syndrome as compared to members of the general public not equally exposed.
24. Upon termination from the job, plaintiff was required to search for at least two jobs per week. Plaintiff continued to seek employment by making 15-20 applications, telephone calls and interviews at Shoney's, Belk's, S H Industries, and Best Western Hotel, to name a few. These efforts constituted a reasonable attempt to obtain suitable employment.
*******************
Based upon the foregoing stipulations and findings of fact, the undersigned make the following
CONCLUSIONS OF LAW
1. While employed by Defendant-Employer, plaintiff contracted carpal tunnel syndrome in her right wrist and hand which was due to causes and conditions characteristic of and peculiar to her particular employment as a lead folder and which is not an ordinary disease of life to which the general public is equally exposed outside of this employment. N.C. Gen. Stat. § 97-53(13). Booker v. Duke Medical Center, 297 N.C. 458,256 S.E.2d 189(1979).
2. As a result of plaintiff's carpal tunnel syndrome, plaintiff is entitled to compensation for temporary total disability benefits for ten weeks, representing the time she was laid off by defendant-employer on or about April 15, 1993, until the time she returned to work, on or about July 1, 1993, and temporary total disability which has accrued from the date she was terminated on August 17, 1994, until plaintiff returns to work, or until it is otherwise ordered by the Commission. N.C. Gen. Stat. § 97-2(9); N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendant provide medical treatment and rehabilitation now and in the future as is necessary as a result of plaintiff's carpal tunnel syndrome to the extent such treatment tends or tended to effect a cure, give relief, or lessen plaintiff's disability. N.C. Gen. Stat. § 97-25; 97-2(19).
4. Defendants are entitled to receive a credit for employment compensation benefits received by plaintiff. N.C. Gen. Stat. § 97-42.1.
*******************
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following
AWARD
1. Subject to a reasonable attorney's fee herein approved, the defendants shall pay the plaintiff in a lump sum, temporary total disability benefits at the compensation rate of $130.67 per week for the ten week period beginning April 15, 1993 until on or about July 1, 1993. Defendants shall further pay temporary total disability benefits from August 17, 1994 through the present time until plaintiff returns to work or it is otherwise ordered by the Commission. Compensation due which has accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fees hereinafter provided. Defendants shall receive a credit for unemployment compensation received by plaintiff during the above time period.
2. Defendants shall pay medical expenses incurred or to be incurred as a result of plaintiff's occupational disease for so long as such examinations and treatments may reasonably be required to effect a cure, or give relief, or will tend to lessen the period of plaintiff's disability from her compensable occupational disease.
3. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under Paragraph 1 of this Award is approved for plaintiff's counsel. Twenty-five percent of the lump sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be deducted from the sum due plaintiff and paid directly to plaintiff's counsel. Consideration and designation of this attorney's fee contemplates that the counsel for the plaintiff shall continue and is hereby ORDERED to monitor the submission of medical expenses to defendant-employer.
*******************
Defendants shall bear the costs.
IT IS FURTHER ORDERED that this case be REMOVED from the Full Commission hearing docket.
This the _____ day of ____________________, 1997.
 S/ _____________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ ______________________ COY M. VANCE COMMISSIONER
S/ ______________________ MORGAN S. CHAPMAN DEPUTY COMMISSIONER
JHBjr/abk